USCA1 Opinion

 

 February 2, 1993 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-1587 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. MICHAEL IDOWU TUNDE AKINOLA, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, and ____________________ Stahl, Circuit Judge. _____________ ____________________ David N. Cicilline for appellant. __________________ Gerard B. Sullivan, Assistant U.S. Attorney, with whom Lincoln C. __________________ __________ Almond, U.S. Attorney and Margaret E. Curran, Assistant U.S. Attorney, ______ __________________ were on brief for appellee. ____________________ February 2, 1993 ____________________ STAHL, Circuit Judge. Defendant-appellant Michael _____________ Idowu Tunde Akinola ("Akinola") launches a five-pronged attack on his conviction for conspiracy to possess with intent to distribute heroin and possession with intent to distribute heroin.1 We address the following claimed errors in detail: 1) unconstitutional denial of chosen counsel when the Magistrate Judge denied his desired counsel's motion for admission pro hac vice; 2) erroneous denial of his motion for ___ ___ ____ judgment of acquittal; 3) the impermissible prosecutorial comment on his failure to testify and the trial court's subsequent inadequate curative instruction; and 4) the trial court's improper jury instruction. For the reasons set forth below, we affirm both counts of conviction. I. I. __ Factual Background Factual Background __________________ We begin by summarizing the evidence in the light most favorable to the government. United States v. Abreu, ______________ _____ 952 F.2d 1458, 1460 (1st Cir.), cert. denied, U.S. , _____ ______ ___ ___ 112 S. Ct. 1695 (1992). On June 30, 1991, Patrolman Donald L. Mong of the East Greenwich, Rhode Island, Police Department, was working a routine patrol in a marked cruiser. At approximately 5 ____________________ 1. Akinola was arrested, tried and convicted along with a co-defendant, Joseph Gullity, whose appeal we have already decided. United States v. Gullity, No. 92-1586 (1st Cir. _____________ _______ Dec. 14, 1992) (unpublished). -2- 2 p.m., Mong noticed that a car which had just passed perpendicular to his ("the suspect car") did not have a front license plate. Mong and Akinola made eye contact as the suspect car passed Mong. Mong pulled out and began to follow the vehicle, in which Akinola was the driver and Gullity the passenger. When Mong positioned himself behind the suspect car, it accelerated and began to pull away from Mong, eventually reaching a speed of 50 miles per hour in a residential area posted for 25 miles per hour. Mong closed the gap sufficiently so that he could read the vehicle's rear license plate number which he transmitted to police headquarters in order to obtain as much information about the car as possible. As appellant's car slowed for intersection traffic, Mong shortened the distance between the two vehicles. He then observed Akinola and Gullity having a spirited conversation in which he could see Akinola's head moving and his lips moving fast "as though he was trying to get out a lot of information quickly." After traffic cleared, the suspect car turned left at the intersection, followed by Mong. Again, the suspect car began pulling away from Mong, despite the latter's speed of 50 miles per hour. At that time, the two vehicles were travelling in a 35 mile per hour zone. The suspect car soon approached the vicinity of an entrance ramp for interstate route 95. Although Mong had yet -3- 3 to receive any information on the suspect car, he wanted to avoid following it onto the interstate, and thus activated his car's emergency overhead lights. The suspect car did not enter the interstate, nor, however, did it stop in response to the emergency lights. Mong then flashed his car's headlights and turned on his siren, after which Akinola appeared to glance into his rear-view mirror. After travelling approximately 200 yards further, and passing at least two areas suitable for pulling over, Akinola entered a movie theater parking lot, stopping the vehicle near the front of the theater entrance. Between Mong radioing for information and the suspect car stopping, the vehicles covered about one and one-half miles. As Mong was informing his dispatcher that both vehicles had stopped, Akinola exited his vehicle and began yelling at Mong in an "agitated" manner. Mong then exited his vehicle, while Akinola continued toward him, yelling at Mong and toward Gullity--who was still seated in the car--in English to Mong and to Gullity in another language which Mong did not understand, which later turned out to be the African dialect Yoruba. Although Mong ordered Akinola to return to his car, Akinola continued towards him, still yelling bilingually. Akinola then began shoving Mong, but after a scuffle, Mong was able to pin Akinola on the ground, handcuff him, and then lock him in the rear of his cruiser. -4- 4 Meanwhile, during the Mong-Akinola imbroglio, Gullity walked into the theater lobby. After securing Akinola, Mong brought Gullity back to the parking lot, whereupon a citizen bystander, Michael Melchor, directed Mong's attention to a nearby vehicle, under which Melchor claimed he had seen Gullity kick an object he had removed from his shirt pocket. Mong retrieved the object, which turned out to be a tissue containing 46.5 grams of heroin. Akinola was subsequently indicted and convicted on charges of conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. 841(a)(1), (b)(1)(c) and 846, and possession with intent to distribute heroin, in violation of 21 U.S.C. 841(a)(1), (b)(1)(c). Following his conviction, he was sentenced to a term of 46 months imprisonment. II. II. ___ Pretrial Proceedings Pretrial Proceedings ____________________ Akinola initially appeared in district court on July 15, 1991, at which time attorney John F. Cicilline entered an appearance on Akinola's behalf. A probable cause and detention hearing was then scheduled for July 18, 1991. On the scheduled date, attorney John M. Cicilline appeared on behalf of Gullity, and attorney David N. Cicilline attempted to represent Akinola. John F. Cicilline was not present at the hearing. Magistrate Judge Boudewyns did not permit David N. Cicilline to represent Akinola because he was not a member -5- 5 of Rhode Island's District bar and because John F. Cicilline was still listed as counsel of record and had not withdrawn from the case. The Magistrate Judge also denied John M. Cicilline's motion to admit David N. Cicilline pro hac vice, ___ ___ ____ but scheduled a hearing for July 23, 1991, to further consider the matter. John F. Cicilline appeared at the July 23, 1991, hearing and requested the Magistrate Judge to reconsider his denial of the pro hac vice motion. That request was denied ___ ___ ____ for several reasons, which appellant now argues were erroneous. We need not address the merits of this particular claim, however, because appellant's failure to preserve the issue leaves us without jurisdiction to consider the matter. A brief explanation follows. The courts of appeals have jurisdiction over appeals "from all final decisions of the district courts of the United States." 28 U.S.C. 1291; United States v. ______________ Ecker, 923 F.2d 7, 8 (1st Cir. 1991). Furthermore, "[t]o be _____ a final order of the district court within the meaning of section 1291, the magistrate's decision must have been reviewed by the district court, which retains ultimate decision-making power." Id. (quoting Siers v. Morrash, 700 ___ _____ _______ F.2d 113, 115 (3d Cir. 1983) and cases cited therein) (internal quotes omitted). See generally Pagano v. Frank, ___ _________ ______ _____ No. 92-1952, slip op. at 4-7 (1st Cir. Jan. 13, 1993). In -6- 6 the case at bar, there is no dispute that the Magistrate Judge's order was not brought before the district court via either of the two methods countenanced in Ecker.2 Appellant _____ seeks to bypass this apparent jurisdictional blockage by arguing that his apparent default is excused by the Magistrate Judge's lack of warning, in his order, that failure to seek district court relief would result in waiver of appellate rights. It is true, as appellant asserts, that United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986) _____________ _______________ mandated such notice in certain cases to protect the rights of pro se litigants. But here, Akinola was represented by ___ __ experienced counsel at the time of the Magistrate Judge's ruling. Moreover, as we pointed out during oral argument, even when such a warning is required, it is necessary only as part of a Magistrate Judge's report and recommendation to the district judge, 28 U.S.C. 636(b)(1)(B), (C), and not when the Magistrate Judge issues a non-dispositive order. 28 U.S.C. 636(b)(1)(A); See, e.g., M.S. Chambers & Son, Inc. ___ ____ __________________________ v. Tambrands, Inc., 118 F.R.D. 274, 279 (D. Mass. 1987) ________________ (giving waiver notice only "to the extent that [Magistrate's] ____________________ 2. In Ecker we noted the existence of two categories of _____ magistrate's orders--"self-operating" and "non-self- operating." The former type, pursuant to 28 U.S.C. 636(b)(1)(A), which cover most pre-trial and discovery matters, are valid when entered and can be challenged by a motion for reconsideration directed to the district court. Non-self-operating orders are not valid until the district court accepts the magistrate's report and recommendation and enters an order or judgment. 28 U.S.C. 636(b)(1)(A), (B). -7- 7 ruling may be considered a report and recommendation"). Therefore, the lack of such notice in this case is of no help to appellant, and thus we are without jurisdiction to consider the Magistrate's pro hac vice ruling. ___ ___ ____ III. III. ____ Alleged Trial Errors Alleged Trial Errors ____________________ A. Denial of Rule 29 Motion for Acquittal A. Denial of Rule 29 Motion for Acquittal ___________________________________________ As we have recently reiterated, we review the district court's denial of a Rule 29 motion by "scrutinizing the record in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the verdict." United States v. Gonzalez-Torres, No. 91-2140, slip op. at 5 _____________ _______________ (1st Cir. Nov. 20, 1992) (citing United States v. Amparo, 961 _____________ ______ F.2d 288, 290 (1st Cir.), cert. denied, U.S. , 113 S. _____ ______ ___ ___ Ct. 224 (1992)). If, upon such a reading of the record, we conclude that a rational jury could have found the defendant _____ guilty beyond a reasonable doubt, then we must affirm the district court. Id.; United States v. Plummer, 964 F.2d ___ _____________ _______ 1251, 1254 (1st Cir.), cert. denied, U.S. , 113 S. Ct. _____ ______ ___ ___ 350 (1992). Moreover, the prosecution need not exclude every reasonable hypothesis of innocence and may prove its entire case through the use of circumstantial evidence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt. Gonzalez-Torres, No. 91-2140, slip _______________ op. at 5 (citations omitted). -8- 8 1. Possession with Intent to Distribute 1. Possession with Intent to Distribute _______________________________________ In order to convict Akinola of possession with intent to distribute heroin, the government must prove that he knowingly and intentionally possessed the heroin and that he did so with the intent to distribute it. Unites States v. _____________ Barnes, 890 F.2d 545, 549 (1st Cir. 1989), cert. denied, 494 ______ _____ ______ U.S. 1019 (1990); United States v. Latham, 874 F.2d 852, 863 _____________ ______ (1st Cir. 1989). In addition, and especially relevant to the case at bar, the government need not prove that Akinola actually possessed the heroin. Instead, proof of constructive possession is sufficient to support a conviction. United States v. Martinez, 922 F.2d 914, 923 (1st _____________ ________ Cir. 1991); Latham, 874 F.2d at 861. Constructive ______ possession may be proved by demonstrating defendant's power and intent to exercise ownership, dominion, or control over the contraband itself, or over the area in which the contraband was concealed. Constructive possession may be sole or joint and may be achieved directly or through others. United States v. Ocampo-Guarin, 968 F.2d 1406, 1409-10 (1st ______________ _____________ Cir. 1992) (citations and quotations omitted); United States _____________ v. Vargas, 945 F.2d 426, 428 (1st Cir. 1991) (citations ______ omitted). The government concedes that it has no direct evidence of Akinola's actual possession of the heroin. -9- 9 Instead, the case against Akinola is based on an inferential chain of circumstantial evidence. The government argues that Akinola's actions after he became aware of Mong's presence all support the conclusion that he had knowledge of the heroin in Gullity's pocket. Specifically, the government relies on Mong's testimony that Akinola suddenly accelerated after he and Mong made initial eye contact, speeding through a residential neighborhood at twice the speed limit. Later, when Akinola was forced to slow for traffic, he and Gullity were seen in an animated conversation, which the government claims related to the heroin and what to do in the face of Mong's presence. Next, the government points to Akinola's failure to yield after Mong activated his lights and sirens, passing at least two suitable turnoffs before pulling into the movie theater parking lot, as further evidence of evasion. In addition, the government argues that Akinola's physical assault on Mong was an attempt at creating a diversion so that Gullity could dispose of the heroin. Finally, the government claims that Akinola was shouting to Gullity in the Yoruba language in order to give Gullity instructions which Mong would be unable to understand. The government argues that Akinola was instructing Gullity to dispose of the heroin, which Gullity did, albeit unsuccessfully. -10- 10 Appellant contends that any inference of either knowledge or dominion and control drawn from the above described events is nothing more than rank speculation, resulting from the government's attempt to "pile inference upon inference." Although this is a close case, we reject appellant's exhortations. Based on the evidence of Akinola's evasive actions following the initial contact with Mong, the jury could infer that he knew of the heroin in Gullity's pocket. Further, the jury could conclude that the pair's animated conversation was a reflection of Akinola's knowledge of the heroin. Additionally, a rational jury could conclude that Akinola's initiation of physical conflict with Mong was a diversion intended to allow Gullity to get away with, or dispose of, the heroin. The jury could have also found that Akinola's Yoruban communication to Gullity related to the heroin, given the temporal proximity between Akinola's actions, his unprovoked assault on Mong, the communication, and Gullity's actions. Moreover, the same events could lead a jury to conclude that Akinola--through Gullity--was attempting to exercise his dominion and control over the heroin. Finally, evidence indicated that the amount of heroin seized was equivalent to 2,300 doses. That fact, combined with testimony to the effect that neither Akinola nor Gullity were -11- 11 heroin users, supports a conclusion that the heroin was intended for distribution. See Vargas, 945 F.2d at 428-29. ___ ______ With respect to appellant's claim of inference- piling, we recall, as we did in a recent case, the words of Judge Aldrich: The rule is not that an inference, no matter how reasonable, is to be rejected if it in turn depends upon another reasonable inference; rather, the question is whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt. United States v. Clifford, No. 92-1748, slip op. at 6 (1st ______________ ________ Cir. Nov. 20, 1992) (quoting Dirring v. United States, 328 _______ _____________ F.2d 512, 515 (1st Cir. 1964)). Based on the foregoing, we find the evidence of Akinola's constructive possession of the heroin is sufficient to sustain his conviction for possession with intent to distribute heroin. 2. Conspiracy to Possess with Intent to Distribute 2. Conspiracy to Possess with Intent to Distribute __________________________________________________ To support Akinola's conviction on this count, the government must prove the existence of a conspiracy, the defendant's knowledge of it, and his participation in it. In addition, the government must show Akinola's intent to both agree with his co-conspirator, and to commit the substantive offense. Clifford, slip op. at 2. ________ "A criminal conspiracy is a tacit or explicit agreement to perform an unlawful act, which can be established by direct or circumstantial evidence that the -12- 12 putative co-conspirators agreed and intended to facilitate the aims of the alleged unlawful activity." Vargas, 945 F.2d ______ at 429 (citations and internal quotations omitted). The government essentially argues that the same circumstantial facts which supported Akinola's guilt on the possession count also support the conspiracy conviction. Appellant argues that the government's case is based on little more than Akinola's presence in the vehicle with Gullity. We disagree that the evidence in this case supports a finding of no more than that Akinola was merely present with Gullity. As we have already noted, the jury could have found that Akinola knew of the heroin prior to Mong's presence based on his sudden acceleration at the sight of Mong. In addition, the animated conversation and Akinola's actions in the parking lot, when he first shouted toward Gullity and then attempted to create a diversion for him, could be indicative of the existence of an agreement between them. This is especially true since the parking lot incident occurred soon after their animated conversation, which occurred after Mong had been following for some time. Although this count, too, presents a close call, we conclude that a rational jury could reasonably infer from Akinola's actions the existence of an agreement with Gullity to possess with intent to distribute the heroin. -13- 13 B. Prosecutorial Misconduct and Curative Instruction B. Prosecutorial Misconduct and Curative Instruction _____________________________________________________ During closing argument, the prosecutor made the following statement: We must show you that defendant Akinola knew the heroin was there. And we do that by showing a high speed chase, an animated conversation, a failure to yield, an unprovoked physical assault and yelling in a foreign language which are _________ unexplained by anything other than ___________________________ knowledge of the heroin in the car. (emphasis added) Defense counsel objected, on the basis that the emphasized portion of the argument constituted impermissible comment on Akinola's failure to testify. The trial court initially overruled the objection, but then, sua sponte, gave the ___ ______ following instruction to the jury: Excuse me. I don't mean to interpret (sic) you, Mr. Sullivan. Let me make one thing clear to the jury. I am sure Mr. Sullivan says unexplained, what he is referring to is unexplained by the facts that have been presented to you. As I told you before, the defendants don't have any obligation to explain anything. And I'm sure that's what Mr. Sullivan is referring to. On appeal, Akinola reiterates the claim of impermissible comment, and also claims that the trial court's curative instruction was so deficient as to compound the prosecution's error. We disagree. It is beyond question that comment on a defendant's failure to testify is violative of the Fifth Amendment -14- 14 guarantee against self-incrimination. Griffin v. California, _______ __________ 380 U.S. 609 (1965); United States v. Lavoie, 721 F.2d 407 ______________ ______ (1st Cir. 1983), cert. denied, 465 U.S. 1069 (1984). The _____ ______ standard by which we review potential violations is whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. United States v. Glantz, 810 F.2d 316, 322 (1st Cir.), cert. ______________ ______ _____ denied, 482 U.S. 929 (1987) (citations and quotations ______ omitted). We review any such violation for harmless error. United States v. Hasting, 461 U.S. 499, 508-12 (1983); ______________ _______ United States v. Cox, 752 F.2d 741, 746 (1st Cir. 1985). See _____________ ___ ___ generally United States v. Lilly, No. 92-2192, slip op. at _________ ______________ _____ 14-16 (1st Cir. Dec. 4, 1992). Having read the challenged comment in the context of the entire closing argument, we are satisfied that the use of the word "unexplained", while perhaps unfortunate, did not stray into forbidden territory nor was it intended to do so. Instead, consistent with the circumstantial nature of the case, the prosecutor recounted each of the events culminating in Akinola's arrest, and followed each by suggesting to the jury the government-preferred inference.3 In using ____________________ 3. Some examples include, "The only reason Akinola did that was his knowledge of the heroin;" "There is no other plausible explanation for Akinola jumping out of the car." -15- 15 "unexplained," the prosecutor was attempting to reinforce his thesis that Akinola's actions could only be interpreted in ___________ one way, and could not logically be consistent with anything except Akinola's guilt. The prosecutor's comments here are somewhat reminiscent of those in United States v. Skandier, 758 F.2d _____________ ________ 43 (1st Cir. 1985), where the prosecutor concluded his argument by saying: [I] will have a chance to speak with you one more time and see if [defense counsel] can explain the story that would be any different with regard to the responsibility of the defendant in this case. So I submit to you that he cannot. Id. at 45. ___ We concluded that such a "`how-does-he-explain'" argument was improper for two reasons--the Fifth Amendment transgression, and the apparent shift of the burden of proof to the defendant. Id. In reaching that conclusion, we relied in ___ part on United States v. Wilkins, 659 F.2d 769, 774 (7th ______________ _______ Cir.), cert. denied, 454 U.S. 1102 (1981), wherein the court _____ ______ held that the prosecutor's statements that the government's theory was the "only explanation" and "[s]ee if defendant's attorney explains ... " were improper comment on defendant's failure to testify. Unlike Skandier, however, the ________ prosecutor's remark here was clearly aimed at the evidence, -16- 16 rather than at the defendant. Thus, we find that the comment here at issue did not run roughshod over Akinola's rights.4 C. Final Jury Instructions C. Final Jury Instructions ___________________________ Appellant assigns two errors to the trial court's final instructions. First, appellant argues that the trial court neglected to explain that while it might draw inferences from circumstantial evidence, it was not permitted to engage in speculation or conjecture to do so. However, at the close of trial, the judge instructed the jury, inter alia, to _____ ____ Bear in mind though, as I said before, that in order to draw such an inference [from circumstantial evidence] you have to be careful that the inference is a reasonable one and that it is directly based on facts that have been proven by the direct evidence, the testimony of witnesses or exhibits. Having read the instructions in their entirety, including the above-quoted section, we conclude that while the trial court did not use appellant's suggested words, the jury members ____________________ 4. We note further that while the court's immediate curative instruction dealt with the burden of proof shift and made no mention of the Fifth Amendment, the court twice gave the jury Fifth Amendment instructions, including once just before deliberations. Based on that combination of instructions, we are satisfied that any error was rendered harmless. Indeed, in a close case such as this, it is the combination of the trial judge's instructions, and not the "strong evidence of defendant's guilt"--as described by the government--that would render the prosecutor's putative violation harmless. Cf. Lilly, slip op. at 19 (strength of government's case ___ _____ contributed to rendering harmless potentially improper prosecutorial comment); Skandier, 758 F.2d at 46 (same). ________ -17- 17 were adequately apprised of the proper legal standard to employ. See, e.g., United States v. Noone, 913 F.2d 20, 30 ___ ____ _____________ _____ (1st Cir. 1990), cert. denied, U.S. , 111 S. Ct. 1686 _____ ______ ___ ___ (1991) (refusal to give the particular instruction requested is not error where the court's instruction substantially covers the request and the applicable law). Appellant next argues that the trial court erred in its instructions regarding appellant's failure to testify, about which the court said that the jury "ought not" penalize the defendant for exercising the right not to testify, and "should not" draw inferences from one who has done so. Appellant argues that the trial court's failure to use "must not" in those circumstances is reversible error. We disagree. After defense counsel objected to the "ought not"- "should-not" charge, the judge supplemented his charge by telling the jury, in effect, that he used the terms "ought," "should," and "must" interchangeably, and therefore, where he said that something should not be done, he meant it must not ___________ ________ be done. When reviewing jury instructions, we gauge each instruction in the context of the entire charge. United ______ States v. Boylan, 898 F.2d 230 (1st Cir.), cert. denied, ______ ______ _____ ______ __ U.S. , 111 S. Ct. 139 (1990). Again, having read the ____ entire charge, we are satisfied that the judge's supplemental caution to the jury cleared up any misunderstanding. -18- 18 Finally, we have considered appellant's claim of erroneous admission of "bad act" evidence, and find it to be without merit. IV. IV. ___ Conclusion Conclusion __________ Appellant's conviction is affirmed. affirmed ________ -19- 19