# United States Court of Appeals
## For the First Circuit

No. 07-1983

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES GLOVER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lipez, Merritt,[*] and Howard
Circuit Judges.

Charles W. Rankin, with whom Michelle Menkin and Rankin &
Sultan, were on brief, for appellant.
Matthew D. Krueger, Attorney, United States Department of
Justice, with whom Michael J. Sullivan, United States Attorney,
was on brief, for appellee.

February 26, 2009

[*]Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.   James Glover challenges his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), claiming that comments made by the prosecutor during the closing argument at his trial were improper.   He also challenges his sentence in two respects:  the classification of his prior conviction for assault and battery with a dangerous weapon as a "crime of violence" under U.S.S.G. § 2K2.1(a)(2) and the overall reasonableness of his sentence.

## I.  Factual Background

In September 2005, Boston Police Officers Joseph Marrero and Manual Blas approached Glover while they were patrolling a housing development.  The officers testified that they asked Glover his name and whether he lived in the development.  In response, he first reached toward his back pocket, then brought his hands forward before he took off running from the officers.  They chased him, with Officer Marrero being the closest in pursuit.  Marrero testified that he saw Glover remove a tan object from the right side of his waist area and hold the object in his right hand. Glover then turned a corner, and Marrero lost sight of him for several seconds.  When they caught up to and arrested Glover, the officers found a small amount of marijuana in his pocket, but no weapons and no tan object.

Shortly thereafter, a .25 caliber handgun with an ivory handle was recovered from along the path of the chase.  The gun was

lying in plain view near the corner where Marrero testified that he had lost sight of Glover. Glover was charged with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

At trial, the government argued that Glover had the ivory-handled gun on his person when he fled from the officers, and discarded it while he was briefly out of their sight. Glover, for his part, argued that someone else had placed the gun on the ground where it was recovered, possibly as a "community gun" (a gun that a group of people share and store in a public but concealed location). Glover introduced testimony that a number of community guns had been recovered by the Boston Police Department in that same area. Glover also argued that he would not have been likely to reach for or discard a firearm with his right hand, as he is left-handed; he introduced handwriting evidence to this effect at trial.

Defense counsel objected to several comments in the government's closing argument, to be described in detail later, but the district court overruled those objections. The jury convicted Glover of possessing a firearm after having been convicted of a felony.

Glover objected to the Presentence Report ("PSR") prepared for his sentencing. He disputed the classification of his prior conviction for assault and battery with a dangerous weapon

-3-

("ABDW") as a "crime of violence" under U.S.S.G. § 2K2.1(a)(2). Glover also requested either a U.S.S.G. § 4A1.3(b) downward departure based on his criminal history, or a variance based on the sentencing factors set out in 18 U.S.C. § 3553(a). Glover argued specifically that his criminal history points under the Guidelines overstated his actual criminal history, and in light of this, that he should receive a below-Guidelines sentence. More specifically, he argued that he was already effectively serving incarceration time for the instant felon-in-possession offense because the offense was also a violation of supervised release conditions imposed on an earlier charge. He argued that the time served on the supervised release violation should "count" toward his current sentence. He also claimed that a then-proposed amendment to the Guidelines relating to cocaine base (crack cocaine) offenses should result in a reduction of his sentence for the instant offense. Glover also stressed that he had a positive future, because he had achieved steady employment prior to committing the offense.

The district court accepted the PSR's classification of the ABDW conviction, stating, "[B]ased on the charging document itself, I could determine that this is a crime of violence." The court also found, however, that a variance from the Guidelines range of 100-120 months was warranted, and sentenced Glover to 92 months' imprisonment, followed by three years of supervised release. This appeal followed.

-4-

## II.  Closing Argument

Glover argues that his conviction should be set aside because the prosecutor made improper comments in closing argument at trial.  We analyze de novo whether the comments were improper. United States v. Balsam, 203 F.3d 72, 87 (1st Cir. 2000).  If we determine that the comments were improper and the objection was preserved, we review for harmless error under Chapman v. California, 386 U.S. 18, 24 (1967).  United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996).  Absent an objection below, however, our review is for plain error only.  Id.

Glover argues that four specific comments in the government's closing argument were improper.  We set forth the comments in the order in which they were delivered.

After briefly summarizing the evidence, the prosecutor stated ("Comment One"):

> So I guess the questions become, well, straightforward:  Does it make sense?  Or turn the question the other way:  Is there anything that doesn't make sense.  Well, I submit to you that if you look at it carefully, it makes perfect sense.  If you look at it carefully, there's nothing that doesn't make sense.

(emphasis added).

The second comment ("Comment Two") followed a recounting of Officer Marrero's testimony that he had seen a tan object in Glover's hand.  The prosecutor asked, "Is there any reason to doubt that testimony?"

-5-

The third comment ("Comment Three") concerned evidence that the defendant wrote with his left hand.

> Clearly, okay, the defendant writes with his left hand. He may prefer to do some things left-handed. We don't know what those other things are. Officer Blas, for example, he writes left-handed but he shoots right-handed.

(emphasis added).

The final comment ("Comment Four") concerned the government's theory that Glover had dropped the firearm on the ground where it was recovered.

> You saw the area, saw the photographs of the undisturbed firearm. . . . The firearm was out in the open, it was not hidden. What other explanation can there be? . . . There was some testimony about community guns, but all that testimony about community guns, about guns stashed somewhere, is that the guns were hidden. You wouldn't put a loaded firearm in the open by a stairwell in the middle of a development. It doesn't make any sense.

(emphasis added).

Immediately after the government closed, defense counsel objected to Comments Three and Four, maintaining that these two comments impermissibly shifted the burden of proof. He argued that the comments called for the defendant to prove that he did other activities left-handed, or to prove that the gun did not belong to him. The district court overruled both objections.

On appeal, Glover argues that these statements, either individually or in combination, shifted the burden of proof and also constituted impermissible comments on his failure to testify,

-6-

in violation of the Fifth Amendment guarantee against self-incrimination.[1]  Glover also argues for the first time that Comments One and Two were improper for the same reasons.

The closing argument is "an especially delicate point in the trial process," and we scrutinize comments that may either shift the burden of proof or are comments on a defendant's failure to testify.  See United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995).

As to comments that shift the burden, we stated in United States v. Diaz-Diaz, 433 F.3d 128, 135 (1st Cir. 2005) that "a prosecutor may cross the line [into impermissibility] by arguing to the jury that the defendant is obligated to present evidence of his innocence."  The case of United States v. Skandier, 758 F.2d 43 (1st Cir. 1985) is illustrative.  There, the prosecutor stated in closing argument, "Now, at this time the defense counsel will address you; . . . [then] I will have a chance to speak with you one more time and see if he can explain the story that would be any different with regard to the responsibility of the defendant in this case."  Id. at 45 (emphasis added).  We held this comment to

<hr />

[1] The government maintains that Glover has forfeited any Fifth Amendment argument, as his objection below was only that burden of proof had been impermissibly shifted.  We do not need to decide this issue here, and there are reasons not to.  The two grounds for objection overlap in this case; we consider the prosecutor's statements under the totality of the circumstances, Balsam, 203 F.3d at 87 n.19, 88 n.20; and the standard of review does not effect the result in any event.

have impermissibly shifted the burden of proof to the defendant. Id. See also Diaz-Diaz, 433 F.3d at 135 (statement that "[defense] counsel can call this witness, just like the United States," impermissibly shifted the burden of proof).

When assessing whether a prosecutor's comments violate the Fifth Amendment guarantee against self-incrimination, we ask whether "'the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" Wilkerson, 411 F.3d at 9 (quoting Wihbey, 75 F.3d at 769). In United States v. Cox, 752 F.2d 741 (1st Cir. 1985), we held a prosecutor's repeated statements in closing argument, asking "how does [defendant] explain" certain evidence, to be impermissible and a "severe violation of the Griffin rule." Id. at 745 (discussing Griffin v. California, 380 U.S. 609 (1965)); see also Wihbey, 75 F.3d at 770 (prosecutor's statement that, "if [defense counsel] can stand up and explain away that conversation to you, then you should [acquit defendant]," was impermissible comment on defendant's failure to testify); United States v. Roberts, 119 F.3d 1006, 1015 (1st Cir. 1997) (statement that "the defendant has the same responsibility [as the government] and that is to present a compelling case," held impermissible).

The government does, however, have reasonable latitude to operate within a closing argument. Where the defendant has

presented a defense, as Glover did here, the government is permitted to discuss competing inferences from the evidence on the record. In United States v. Henderson, 320 F.3d 92, 105 (1st Cir. 2003), the defendant had attempted to impeach the credibility of a government witness by showing that the witness was under the influence of drugs during an alleged drug transaction. The prosecutor stated, "And don't the tapes prove to you how absurd the defendant's claims are that [the witness] was too high . . . to have accurately perceived the events . . . ? Don't the tapes, in fact, prove [the opposite]?" Id. We held these comments to be permissible discussions of competing inferences. The government is also permitted to comment on the plausibility of the defendant's theory. See United States v. Glantz, 810 F.2d 316, 321 (1st Cir. 1987) (reversing district court's grant of new trial where prosecutor commented on failure of defendants to introduce specific documentary evidence because, in context, prosecutor was commenting on plausibility of defense theory). When commenting on the plausibility of a defense theory, the government's focus must be on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what he or she has shown or failed to show. See Wilkerson, 411 F.3d at 8-9 (comment that there was "no real evidence" and "pretty much nothing" to support defendant's version of events held permissible as directed at evidence); see also United States v. Akinola, 985 F.2d 1105, 1111 (1st Cir. 1993)

(statement in drug conspiracy case that certain actions undertaken by defendant were "unexplained by anything other than knowledge of the heroin in the car" held permissible as directed at evidence.)

Even if we conclude that prosecutorial comments are improper, "reversible error will be found only if the [comments] were 'both inappropriate and harmful.'" United States v. Laboy-Delgado, 84 F.3d 22, 29 (1st Cir. 1996). When determining whether comments are "harmful," we consider the "totality of the circumstances," including the severity of the misconduct, the prosecutor's purpose in making the statement (i.e., whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative instructions. See Balsam, 203 F.3d at 87 n.19, at 88 n.20.

A specific curative instruction can mitigate the damage of an improper comment, Wihbey, 75 F.3d at 770-71, and the content of the jury instructions can remedy the effects of problematic language employed in the closing argument, Wilkerson, 411 F.3d at 9. Here, the court delivered jury instructions explaining the reasonable doubt standard and the defendant's right to decline to testify.[2]

---

[2] The jury was instructed as to the burden of proof and the Fifth Amendment privilege as follows:

> The law does not require a defendant to prove his innocence or to produce any evidence at all. A defendant has a right to stand on the presumption of innocence and put the government to its burden of proof beyond a

For ease of exposition, we commence with Comment Four and place it in context. The government alleged that Glover had possessed the firearm. Glover asserted that the gun was not his and could have been a community gun. In context, asking "what other explanation can there be?" was an attempt by the prosecutor to refute Glover's preferred interpretation of the evidence. The prosecutor's comments would not be viewed by a jury as suggesting that Glover himself should have taken the stand to provide an explanation, or that Glover was required to prove the gun was not his. The prosecutor was appealing to the jurors' common sense in asking them to credit the government's explanation instead of the defendant's. See Akinola, 985 F.2d at 1111. Comment Four was not improper.

Comment Three presents a closer question, but ultimately we conclude that it, too, was not an improper comment on Glover's failure to testify and did not impermissibly shift the burden of proof. Glover argues that Comment Three, "We don't know what those

---

reasonable doubt.
. . .
A defendant in a criminal case has an absolute right not to testify. The decision as to whether the defendant should or should not testify is left to the defendant. There may be any number of reasons, apart from guilt or innocence, that may form the basis for a decision by the defendant not to testify. You must not draw any inference of guilt or anything else from the fact that the defendant did not testify.

The court went on to mention at least sixteen times in its instructions that the government bears the burden of proof.

-11-

other things are," highlighted for the jury Glover's failure to testify, and suggested that he had the burden to present additional evidence regarding his left-handedness.  Glover had offered the handwriting evidence in support of his defense theory that he would not have used his right hand to toss aside a gun, as the government alleged.  The prosecutor's statement was part of his argument that the handwriting evidence offered only weak support for the defense theory.  The jury would not "naturally and necessarily take it to be a comment on the failure of the accused to testify," or take it as an attempt to shift the burden of proof.  Wilkerson, 411 F.3d at 9; see also Akinola, 985 F.2d at 1111.

There was no plain error in the remaining comments. Glover argues that Comment One's suggestion to "turn the question the other way," (and ask if there is a reason that the prosecution theory doesn't make sense), together with Comments Two (whether there was a reason to doubt Marrero's testimony that he saw a tan object) and Three (that it is unknown what things, other than writing, Glover preferred to do with his left hand), suggested to the jury that the question was not what the government has proven but rather, what the defendant has disproved.  That interpretation stretches the import of the comments too far.  The prosecutor was merely, and permissibly, commenting on the relative plausibility of Glover's and the government's competing explanations.  These comments cannot be said to have shifted the burden of proof,

-12-

keeping in mind the frequency with which the jury was instructed as to the meaning of reasonable doubt.

In sum, the prosecutor's statements were not improper, and therefore we uphold Glover's conviction.

### III. Sentencing

### A. "Crime of Violence"

Glover argues that the trial court improperly classified his 1998 Massachusetts conviction for ABDW, Mass. Gen. Laws ch. 265, § 15A(b), as a "crime of violence" under U.S.S.G. § 2K2.1(a)(2). We disagree.

The Sentencing Guidelines define "crime of violence" as:

> [A]ny offense . . . punishable by imprisonment for a term exceeding one year, that -
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a) (emphasis added).[3] The residual clause of section 4B1.2(a)(2), defining "crime of violence" as an offense

_____

[3] The Guidelines' definition of "crime of violence" closely tracks the definition of "violent felony" in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and the residual clauses in each are identically worded. We have considered these residual clauses to be relatively interchangeable, and have treated interpretations of one as persuasive authority relative to the other. See, e.g., Santos, 363 F.3d at 22 n.5; United States v. Meader, 118 F.3d 876, 882 n.8 (1st Cir. 1997); United States v. Bell, 966 F.2d 703, 704-06 (1st Cir. 1992).

that "involves conduct that presents a serious potential risk of physical injury to another," is at issue here.[4]

We take a categorical approach to classifications of prior convictions. See Taylor v. United States, 495 U.S. 575, 600 (1990); see also James v. United States, 127 S. Ct. 1586, 1594 (2007). "This approach, depending on [the offense underlying the prior conviction], has either one or two steps." United States v. Almenas, 553 F.3d 27, 33 (1st Cir. 2009).

The first step requires a comparison of "the legislature's definition of the relevant offense with the guideline definition of a 'crime of violence.'" Id. When making the comparison, we examine the statutory definition of the offense, ignoring the particular facts underlying the conviction. Id.; United States v. Meader, 118 F.3d 876, 882 (1st Cir. 1997); see also United States v. Giggey, 551 F.3d 27, 38 (1st Cir. 2008). "If [we determine] that a violation of the statute in question necessarily involves each and every element of a violent crime" then we need not look beyond the statutory definition of the offense. Williams, 529 F.3d at 4. If, on the other hand, "the statute's text is broad enough to criminalize both violent and non-violent conduct," we must take a second step to determine if the

---

[4] The parties have not briefed the issue of whether ABDW might also be classified as "crime of violence" under a different provision of U.S.S.G. § 4B1.2(a), and we express no opinion here on the question.

-14-

defendant engaged in the crime's violent variety. Id.; United States v. Winter, 22 F.3d 15, 18 (1st Cir. 1994). At this step, we may "[examine] documents such as charging papers or jury instructions in order to flesh out a predicate offense inquiry." Almenas, 553 F.3d at 33.

Additionally, after the Supreme Court's decision in United States v. Begay, 128 S. Ct. 1581, 1585 (2008), to qualify as a crime of violence under the residual clause, the offense at issue must also "(i) pose a degree of risk that is similar to the degree of risk posed by the enumerated offenses -- namely, arson, burglary, extortion, and offenses involving the use of explosives -- and (ii) be similar 'in kind' to those offenses." Almenas, 553 F.3d at 34; see also United States v. Herrick, 545 F.3d 53, 58 (1st Cir. 2008). An offense will be similar "in kind" to the enumerated offenses if it "typically involve[s] purposeful, 'violent,' and 'aggressive' conduct." Begay, 128 S. Ct. at 1586 (citation omitted); Williams, 529 F.3d at 7 (citation omitted).

Here, we agree with the district court that ABDW qualifies as a crime of violence. And, although Begay was decided after the district court sentenced Glover, we conclude that Begay's additional requirements are satisfied.

We start with the statutory definition of ABDW. The statute applies to an individual who "commits an assault and battery upon another by means of the dangerous weapon." Mass. Gen.

-15-

Laws ch. 265, § 15A(b); Salemme v. Commonwealth, 348 N.E.2d 799, 802 (Mass. 1976) (recognizing that, in order to secure an ABDW conviction under § 15A(b) the government must prove that "intentional force was applied against the victim, and that it was applied by means of the dangerous weapon."

Because a defendant must employ a "dangerous weapon" to be convicted of ABDW, it is evident that the offense poses a serious potential risk of physical injury to another. Although the phrase "dangerous weapon," is not statutorily defined, Massachusetts case law recognizes two "types" of dangerous weapons.[5] First, there are instrumentalities that are considered to be dangerous weapons "per se." These are weapons that are "designed and constructed to produce death or great bodily harm," the classic example being a firearm. Commonwealth v. Appleby, 402 N.E.2d 1051, 1056 (Mass. 1980). Second, there are instrumentalities that, although not inherently dangerous, are considered "dangerous as used." Commonwealth v. Sexton, 680 N.E.2d 23, 25 (Mass. 1997) (citing Appleby, 402 N.E.2d at 1057). Given these definitions of "dangerous weapon," logic dictates that ABDW ineluctably poses a serious potential risk of physical injury: either the perpetrator applied force by means of an instrumentality

---

[5] Under the categorical approach, we may look to case-law to define statutorily undefined terms. See United States v. Mangos, 134 F.3d 460, 463 (1st Cir. 1998).

designed to produce death or great bodily harm, or applied force with an instrumentality by using it in a dangerous manner.

Finally, Begay's additional requirements -- that the offense must pose a degree of risk that is similar to the degree of risk posed by the enumerated offenses and be similar in kind to those offenses -- are easily satisfied here. Because a defendant must employ a dangerous weapon to be convicted of ABDW, the offense poses a risk of injury comparable to the enumerated offenses. And ABDW is similar in kind to the enumerated offenses. It is a purposeful offense, see Commonwealth v. Ford, 677 N.E. 2d 1149, 1152 (Mass. 1997) (ABDW is an intentional crime), that involves conduct at least as aggressive and violent as the conduct at issue encompassed by the enumerated crimes. In fact, ABDW is arguably more aggressive and violent than some of the enumerated crimes because a defendant, to be guilty of ABDW, must intentionally apply force to the victim. Compare Salemme, 348 N.E.2d at 802 (ABDW involves "intentional force . . . applied against the victim"), with Begay, 128 S.Ct. at 1586 (burglary is "unlawful or unprivileged entry into a building or other structure," arson is "causing a fire or explosion with the purpose of destroying a building," and extortion involves "threat of . . . inflicting bodily injury") (internal quotation marks and citations omitted).

In contending that ABDW cannot qualify as a crime of violence, Glover makes essentially two arguments. His first

-17-

argument is based on a line of cases in which we have interpreted the Massachusetts simple assault and battery statute to include two distinct crimes:  harmful battery and offensive touching.  See, e.g., Fernandez, 121 F.3d at 779; United States v. Harris, 964 F.2d 1234, 1237 (1st Cir. 1992).  He argues by extension that ABDW also encompasses two crimes -- harmful battery with a dangerous weapon and offensive touching with a dangerous weapon -- and that it would be incorrect to classify ABDW as a crime of violence, since it can include a conviction for offensive touching.

This analogy to simple assault and battery is inapposite for at least one significant reason.  ABDW introduces a dangerous weapon into the equation, and thus the crime is more likely than simple assault and battery to pose a serious risk of potential injury to another.

Next, Glover argues that there is a hypothetical scenario of non-violent conduct that could result in a conviction for ABDW, and consequently ABDW cannot be, categorically, a "crime of violence."  In particular, Glover points out that a defendant could be convicted of ABDW for consensual sexual activity involving a dangerous weapon.[6]

This argument fails to gain traction.  When determining whether ABDW qualifies as a crime of violence, we are governed by

---

[6] Glover suggests that a shoe could be the dangerous weapon employed in such activity.

-18-

the Supreme Court's admonishment in James that not "every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury" before the offense can be classified as a crime of violence. 126 S. Ct. at 1597. Rather, we are instructed to consider the "ordinary case." Id. Given our analysis above, we can say with confidence that the ordinary ABDW offense creates a serious potential risk of injury to another. See United States v. De Jesus, 984 F.2d 21, 24 (1st Cir. 1993); see also Giggey, 551 F.3d at 41.[7]

Because we conclude that ABDW qualifies as a crime of violence at the first step, we need not examine the charging documents underlying Glover's ABDW conviction. See United States v. Leahy, 473 F.3d 401, 411 (1st Cir. 2007).

## B.  Reasonableness

Glover's second sentencing argument is that the sentence he received, a variance below the Guidelines range, was substantively unreasonable because it should have been even further below the Guidelines range. He bases this argument on his personal circumstances and on the Guidelines' treatment of his criminal history.

---

[7] Moreover, even if a defendant had been convicted of ABDW because he engaged in consensual sexual activity involving a dangerous weapon, that would not necessarily mean that the defendant's conduct failed to create a serious potential risk of injury to another. Sexual activity involving a dangerous weapon, consensual or not, could still present the requisite risk of injury.

-19-

In reviewing a sentence for "substantive reasonableness," we consider the district court's written statement of reasons, the district court's oral explanation of the sentence, and implications that we can fairly draw through a comparison of the PSR's recommendations and the actual sentence imposed. Martin, 520 F.3d at 92; see Gall v. United States, 128 S. Ct. at 596 (sentencing decisions by district courts are reviewed for abuse of discretion, even when sentence is below Guidelines range.)

Here, the Guidelines range for Glover was 100-120 months. The court noted its concern about the operation of the Guidelines in the circumstances of this case. Specifically, the court observed that by virtue of committing the instant offense, Glover had violated his supervised release for his 1999 conviction for distribution of cocaine base. He had been sentenced to 24 months for the supervised release violation, and at the time of sentencing for the instant offense he had served 19 months of that term. Glover received three additional points in his PSR due to the supervised release violation and his having committed the instant offense within two years of being released from prison. U.S.S.G. § 4A1.1(d)-(e). The sentencing court observed:

> The Guidelines are intended to address problems of recidivism like [this], but in this particular case, whatever the sentence that will be imposed on Mr. Glover in this case will need to take into account that for this particular act he will have served 19 months already. I have no difficulty in the abstract with a violation of supervised

> release being consecutive to the offense of conviction, but where the violation of supervised release results in a fairly lengthy term of imprisonment . . . , I believe the [Guidelines] sentence is greater than what is necessary to reflect the seriousness of the offense, to provide deterrence and to promote respect for the law and to protect the public.
>
> Nevertheless, given the nature of the crime, a sentence of some substantial duration is required, and I think I have such a sentence.[8]

The district court decided to vary from the Guidelines and sentenced Glover to 92 months' imprisonment. In the statement of reasons, the court indicated that it was imposing a sentence below the Guidelines because of the nature and circumstances of the offense and the history and characteristics of the defendant, under section 3553(a)(1).

It is apparent from the district judge's explanation of the sentence that he carefully considered Glover's arguments about the time already served for the supervised release violation. As a result, the court imposed a term of incarceration that was below the Guidelines range. In view of the sentence and explanation, as well as the court's statement that it considered the section

---

[8] Glover also claims that his sentence was unreasonable, based on the Amendment 706 to the Guidelines regarding cocaine base offenses. He suggests that, were his conviction for distribution of crack to have occurred after the amendment was adopted, instead of in 1999, his Guidelines sentence could have been about one year less than it actually was. That may be true, but we nevertheless decline to take the next leap: that a lower sentence for that offense would have altered the calculation of criminal history points here. More importantly, the instant offense is unrelated to cocaine base and was thus unaffected by the 2007 amendment.

3553(a) factors, we conclude that the sentence imposed was reasonable.

Accordingly, the conviction and sentence are **<u>affirmed</u>**.