HOWARD, Chief Judge.
These appeals arise out of a widespread corruption scandal at the Puerto Rico Board of Medical Examiners (the “Board”), the former licensing authority for doctors seeking to practice in Puerto Rico. Cesar Berroa, Julio Castro,'Geraldo Castro, Raysa Pacheco-Medina, and Glenda Davila all sought medical licenses but failed to pass the required exams. Undeterred, they attempted to gain certification by obtaining falsified scores. A federal indictment and subsequent jury trial led to convictions on various charges against each defendant.
The appeals raise a litany of claims, and “[ajfter carefully considering each of the defendants’ contentions and extensively reviewing the record,” we address only those claims that are “worthy of discussion; the remainder lack arguable merit.” United States v. Rose, 802 F.3d 114, 117 (1st Cir. 2015).[1]
We affirm the defendants’ convictions for honest-services mail fraud conspiracy, but reverse the convictions for money or property mail fraud and aggravated identity theft, finding the government’s theories of prosecution on those counts to be legally deficient.
I. Facts
All five defendants sought admission to practice medicine in Puerto Rico. The admissions process required applicants to pass a pair of gatekeeping tests: a basic exam and a clinical written exam. Applicants who achieved a minimum score of 700 on each of the two tests would then move on to a practical skills exam. Upon passage of the practical skills exam and completion of the remaining requirements, the Board would issue a regular medical license.
The government presented evidence that each of the defendants failed to achieve the required 700 score on at least one of the gatekeeping exams. As a result, they turned to Yolanda Rodriguez, an employee at the Board who had access to applicant files and the ability to create fraudulent score results. The process was decidedly low-tech: Rodriguez used a photocopier to superimpose passing scores of other applicants onto the failing students’ exam sheets. She then placed the falsified exam sheets back into the applicants’ files. *148 The trial evidence supported a finding that each of the defendants’ files contained a passing score sheet falsified by Rodriguez. Armed with passing scores, the previously unsuccessful applicants completed the remaining requirements and entered practice as medical doctors in Puerto- Rico.
On April 20, 2010, a federal grand jury handed up an omnibus 138-count superseding indictment against the five defendants who have brought these appeals and a myriad of other applicants.[2] All five defendants were indicted for conspiracy to commit honest-services mail fraud, money or property mail fraud, and aggravated identity theft. The government proceeded on consistent underlying theories for all of the defendants: (1) that they joined in a conspiracy to commit honest-services mail fraud in obtaining their medical licenses; (2) that they committed mail fraud by using the resulting licenses to practice medicine for financial gain; and (3) that they committed aggravated identity theft by issuing prescriptions to patients.
After trial, the jury convicted[3] the defendants as follows:
Berroa: mail fraud, honest-services mail fraud conspiracy, and aggravated identity theft;
Julio Castro: mail fraud and honest-services mail fraud conspiracy;
Geraldo Castro: mail fraud and aggravated identity theft;
Pacheco: honest-services mail fraud conspiracy; and
Davila: honest-services mail fraud conspiracy.
II. Sufficiency of the Evidence
The defendants now attack the sufficiency of the evidence supporting their various convictions. These preserved challenges garner de novo review. United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014). “Applying a familiar standard, we consider whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt.” Id. (citation omitted).
A. Money or Property Mail Fraud
Berroa, Julio Castro, and Geraldo Castro appeal their convictions for mail fraud in violation of 18 U.S.C. § 1341. This provision proscribes use of the mails in furtherance of “any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses.” Because we find insufficient evidence to support the conclusion that the defendants obtained money or property “by means of’ their alleged fraud, we reverse these convictions.
The Supreme Court has squarely held that the mail fraud statute is “limited in scope to the protection of property rights.” McNally v. United States, 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Before this ruling, the statute had been used to prosecute “various forms of corruption that deprived victims of ‘intangible rights’ unrelated to money or property.” Cleveland v. United States, 531 U.S. 12, 18, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). McNally expressly curtailed this use of § 1341. Congress later passed a new statute, 18 U.S.C. § 1346, designed to cover one of the intangible rights recognized in the pre-McNally caselaw, namely, “the intangible right of honest services.” Cleveland, 531 U.S. at 19-20, 121 S.Ct. 365 *149 (quoting 18 U.S.C. § 1346). Here, the relevant counts of the indictment allege a scheme to deprive the victims of money or property. Accordingly, we restrict our inquiry to § 1341 for the time being.
The Supreme Court has broadly and unequivocally instructed that “[s]tate and municipal licenses” generally “do not rank as ‘property,’ ” sufficient to support a conviction under § 1341. Id. at 15, 121 S.Ct. 365. In Cleveland, the defendants were alleged to have made false statements in applications for state gaming licenses. The Court began its analysis by explaining that any interest the state had in the licenses was “regulatory,” as opposed to proprietary, in nature. Id. at 20, 121 S.Ct. 365. It noted the government’s concession that many other state licenses, including “medical licenses,” are “purely regulatory.” Id. at 22, 121 S.Ct. 365. But the Court did not rest solely on the fact that the government’s theory of prosecution “stray[ed] from traditional concepts of property.” Id. at 24, 121 S.Ct. 365. Rather, it went on to note that the government’s preferred reading of the statute would result in “a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress.” Id Indeed, “[ejquating issuance of licenses ... with deprivation of property would subject to federal mail' fraud prosecution a wide range of conduct traditionally regulated by state and local authorities.” M. In short, Cleveland squarely precluded the government from seeking mail fraud convictions on the theory that the defendants defrauded the Board out of some property interest in the medical licenses.
Presumably cognizant of this restriction, the government charged a scheme to “de-priv[e] unsuspecting consumers of health care services, health care benefit programs and health care providers, of property and money through the defendants’] knowing[] use of [their] fraudulently obtained medical licensefe].” More specifically, the defendants allegedly used their fraudulent licenses to obtain payment for medical services and issue prescriptions. They continued to write prescriptions at least until about two to three years after receiving their licenses.
In its effort to circumvent Cleveland, the government runs headlong into another Supreme Court precedent. Loughrin v. United States, — U.S. -, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014), involved a prosecution under the bank fraud statute, which prohibits schemes to obtain bank property “by means of false or fraudulent pretenses.” 18 U.S.C. § 1344(2). The Court described the statute’s “by means of’ language, also present in § 1341, as a “textual limitation” on its scope. Loughrin, 134 S.Ct. at 2393. This limitation assuaged federalism concerns about infringing on state criminal jurisdiction. Id. at 2392-93. The Court explained that “by means of’ “typically indicates that the given result (the ‘end’) is achieved, at least in part, through the specified action, instrument, or method (the ’means’), such that the connection between the two is something more than oblique, indirect, and incidental.” Id. at 2393 (citing Webster’s Third New International Dictionary 1399 (2002); 9 Oxford English Dictionary 516 (2d ed. 1989)). Accordingly, “not every but-for cause will do.” Id. Rather, the “by means of’ language requires that the defendant’s fraud be “the mechanism naturally inducing a bank ... to part with money.” [4] Id. Here, the defen *150 dants’ alleged fraud in obtaining their medical licenses cannot be said to have “naturally inducted]” healthcare consumers to part with their money years later.
The government correctly points out that Loughrin interpreted the bank fraud statute, while this case involves the separate prohibition on mail fraud. But, for aught that appears, this is a distinction without a difference. To be sure, these two provisions are not identical. See id. at 2391 (holding that the bank fraud statute, unlike the mail fraud statute, may be violated in two distinct ways). The government, however, offers no explanation at all for why the same “by means of’ language should be read differently in these two contexts. See Smith v. City of Jackson, 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (“[W]hen Congress uses the same language in two statutes having similar purposes, ... it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.”). In fact, to the contrary, the very same federalism concerns underlying this “textual limitation” in the bank fraud statute are equally applicable to mail fraud. See Cleveland, 531 U.S. at 24, 121 S.Ct. 365 (noting resistance to reading which would effect “a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress”). Indeed, the issuance of licenses and permits is “traditionally regulated by state and local authorities.” Id. And medical licenses, much like the gaming licenses at issue in Cleveland, almost invariably are sought and obtained in an effort to realize some monetary profit. Accordingly, under the government’s theory, virtually any false statement in an application for a medical license could constitute a federal crime. Such a broad reading of the statute would impermissibly infringe on the states’ “distinctively sovereign authority to impose criminal penalties for violations of’ licensing schemes, “including making false statements in a license application.” Id. at 23, 121 S.Ct. 365. Just as in Loughrin, the phrase “by means of’ serves as a textual limitation preventing such a usurpation of state criminal jurisdiction.
Our dissenting colleague disagrees, suggesting that Loughrin’s reading of “by means of’ in the context of the bank fraud statute should not inform our interpretation of the identical language in § 1341. But, as the dissent readily concedes, the bank fraud statute was expressly “modeled on” the pre-existing prohibition on mail fraud. S. Rep. No. 98-225, at 378 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3519. Both provisions “proscriben the conduct of executing or attempting to execute ‘a scheme or artifice to defraud’ or to take the property of another ‘by means of false or fraudulent pretenses,' representations, or promises.’ ” Id. (emphasis added). Perhaps unsurprisingly in light of this legislative history, other circuits have consistently applied precedents construing § 1341 to the bank fraud statute. See, e.g., United States v. Saks, 964 F.2d 1514, 1520 (5th Cir. 1992) (“It is well settled that Congress modelled § 1344 on the mail and wire *151 fraud statutes, and that the usual practice is to look to precedents under those statutes to determine its scope and proper interpretation.”); United States v. Young, 952 F.2d 1252, 1255 (10th Cir. 1991) (noting that the two statutes contain “virtually the same language”); United States v. Mason, 902 F.2d 1434, 1441 (9th Cir. 1990) (“[T]he bank fraud statute directly tracks or is parallel to the mail and wire fraud statutes.”), abrogated on other grounds by Dixon v. United States, 548 U.S. 1, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006).
The dissent rejects this longstanding consensus, reasoning that, while the mail fraud and bank fraud statutes employ “equivalent language,” the lack of “contemporaneous drafting” undermines any presumption that Congress intended the phrase “by means of’ to have a similar meaning in both contexts. But we have never imposed any requirement of “contemporaneous drafting” to give rise to a presumption of similar meaning where two statutes employ identical language and one is expressly modeled on the other. We have, for example, held that the wire fraud statute should be construed according to our mail fraud precedents. See United States v. Fermín Castillo, 829 F.2d 1194, 1198 (1st Cir. 1987). We reached this result despite recognizing that the mail fraud statute was significantly “older” than its wire fraud counterpart. Id. Indeed, the substance of the federal prohibition on mail fraud has been in place since 1909. See Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1088, 1130-31; see also Jed S. Rakoff, The Federal Mail Fraud Statute (Part I), 18 Duq. L. Rev. 771, 821 n.225 (1980) (characterizing post-1909 amendments as “chiefly designed to remove ‘surplus’ language from the statute”). The wire fraud statute was not enacted until more than four decades later. See Communications Act Amendments, 1952, ch. 879, § 18(a), 66 Stat. 711, 722. In Fermín Castillo, rather than treating chronology as dispositive, we noted that the wire fraud statute “tracks” the language of § 1341. 829 F.2d at 1198. We also cited legislative history indicating that the former provision was “patterned on” the latter. Id. Each of these considerations applies equally to the bank fraud statute.[5]
*152 The dissent next takes the position that the federalism concerns underlying Lough-rin are not transferrable to the mail fraud context. We disagree. Of course, the mail fraud and bank fraud statutes are predicated on different jurisdictional bases, but that does not mean that the scope of the former provision is unlimited. Indeed, the Supreme Court has expressly recognized that § 1341 “does not purport to reach all frauds.” Schmuck v. United States, 489 U.S. 705, 710, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citation omitted). Rather, it targets “only those limited instances in which the use of the mails is a part of the execution of the fraud.” Id (citation omitted). The mail fraud statute also requires that the fraudulent scheme seek to obtain money or property. See Cleveland, 531 U.S. at 18, 121 S.Ct. 365; McNally, 483 U.S. at 360, 107 S.Ct. 2875.
Adoption of the dissent’s preferred construction of “by means of’ would work “a sweeping expansion of federal criminal jurisdiction.” Loughrin, 134 S.Ct. at 2392 (quoting Cleveland, 531 U.S. at 24, 121 S.Ct. 365). The present appeals provide a case in point. The government’s mail fraud allegations are entirely predicated, upon the falsification of test scores. With these falsified scores in hand, and after completing certain other requirements, the defendants received medical licenses. The Board mailed letters indicating that the licenses were ready for pick-up. Under Cleveland, the defendants had not yet committed mail fraud. The government, however, contends that the mail fraud charges are salvaged by evidence that, in the ensuing years after becoming licensed, the defendants practiced medicine for profit. The government points to no additional instances of fraudulent conduct, instead falling back on the defendants’ “use of [their] fraudulently obtained medical license[s].” Endorsing such a prosecution theory would extend the scope of federal jurisdiction to cover cases where the underlying fraudulent scheme, and the mailing in furtherance thereof, is far removed from any money or property. The Loughrin Court’s citation to Cleveland in discussing these federalism concerns makes clear that they remain relevant in the mail fraud context.
The dissent relies in large part on a string of cases refusing to read a so-called “convergence” requirement into the mail fraud statute. But this is a distinct issue from the causal nexus required under Loughrin. Our decision in United States v. Christopher, 142 F.3d 46 (1st Cir. 1998), illustrates the point. In that case, the defendant argued that, in order to constitute wire fraud, the alleged scheme had to “deceive the same person whom it deprive[d] of money or property.” Id. at 52-53. We rejected this reading of the statute in Christopher, and we impose no such requirement in these appeals. Rather, our reversal of the money or property mail fraud convictions is based on the lack of a sufficiently direct causal nexus to satisfy Loughrin. In Christopher, after disposing of the convergence argument, we proceeded to address the separate issue of causation. See id. at 54; see also United States v. Frost, 125 F.3d 346, 360 (6th Cir. 1997) (“[E]ven the cases which have held that convictions may rest upon the deceit of a person other than the ultimate victim contemplated that the deception was causally related to the scheme to obtain property from the victim.”). In that case, we found “the causal connection between the deception and the loss of property” to be “obvious.” Christopher, 142 F.3d at 54. This characterization was justified by the facts of the case at hand, which were very different from those at issue here. The de *153 fendant was convicted for making misrepresentations to insurance regulators in connection with his acquisition of two companies. More specifically, he assured regulators “that the collateral liens would be paid off by the time of closing, and that assets of the acquired companies would not be used for the purchase.” Id at 49. But, after closing, the acquired companies “loaned” money to satisfy the liens. Id. Similarly, cash belonging to one company was used to pay its purchaser. Id. The wire fraud charges were predicated on these two categories of payments. See id. at 50-51. Thus, the transfers through which the defendant realized the required monetary benefit directly contradicted his prior statements to regulators. In the parlance of Loughrin, the defendant’s lies “naturally inducted]” the resulting benefit. 134 S.Ct. at 2393. As discussed above, the causal connection is much more attenuated in the present case. The other precedents cited by the dissent on this point, like Christopher, deal primarily with the convergence issue, not the required causal connection between the fraud and the obtainment of money or property. In any event, to the extent that these out-of-circuit decisions could be read to be inconsistent with Loughrin, we are bound to follow the standard imposed by the Supreme Court.[6]
Contrary to the dissent’s suggestion, Loughrin’s interpretation of- “by means of’ did not impose a convergence requirement like the one we rejected in Christopher. Indeed, the Court expressly recognized the possibility of bank fraud convictions in cases where the fraud never actually reaches a bank. It explained that “the clause covers property ‘owned by* the bank but in someone else’s custody and control ...; thus, a person violates § 1344(2)’s plain text by deceiving a non-bank custodian into giving up bank property that it holds.” Loughrin, 134 S.Ct. at 2389. To be sure, the Loughrin Court ultimately held that, in the specific context of bank fraud, “by means of’ requires a “false statement [that] will naturally reach [a federally insured] bank (or a custodian of the bank’s property).” Id. at 2394 n.8. But, in contending that our application of Loughrin to § 1341 imposes a convergence requirement, the dissent overlooks its own warning that “what relationships count as close enough to satisfy the phrase ‘by means of will depend almost entirely on context.” Id. Generally speaking, “by means of’ requires “an inquiry into the directness of the relationship between means and ends.” Id. In its initial discussion of the phrase, the Loughrin Court relied upon dictionary definitions. After citing these generally applicable sources of meaning, the Court concluded that, in order to satisfy the bank fraud statute, the false statement must be “the mechanism naturally inducing a bank (or' custodian of bank property) to part with money in its control.” Id. at 2393. It is the specification that the fraud target bank property, not the widely applicable “naturally inducing” standard, that makes context relevant. The Court’s rejection of the “Little Bobby” hypothetical posited by Justice Scalia illustrates the point. In the hypothetical, “Bobbly falsely tells his mother that he got an A on his weekly spelling test and so deserves an extra cookie after dinner.” Id at 2396 (Scalia, J., concurring). Bobby’s mother, who will not be home for dinner, leaves a note for Bob *154 by’s father indicating that Bobby should get an extra cookie. According to Justice Scalia, when Bobby receives his cookie, he has done so “by means of the fib to his mother.” Id. We agree that, in these circumstances, Bobby’s false statement “naturally inducted]” his father to give him an extra cookie. And the Loughrin majority did not dispute the point. Rather, it responded by citing the importance of context and concluded that, in the bank fraud statute, “by means of’ is “best read” to include only those frauds in which the false statement will reach a bank, either directly or indirectly. Id. at 2394 n.8. Of course, this specific application could not possibly apply to all uses of the phrase “by means of.”
In light of the above analysis, there was insufficient evidence to support the defendants’ convictions for money or property mail fraud. Because we find the government’s theory legally deficient, we must reverse these convictions.
B. Honest-Services Mail Fraud Conspiracy
The government also charged the defendants with conspiracy to commit honest-services mail fraud. See 18 U.S.C. §§ 371, 1341, 1346. The four defendants convicted on these counts now appeal. Because we find sufficient evidence to support the convictions, we affirm.
At its core, a conspiracy is “an agreement between two or more persons to accomplish an unlawful purpose.” United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011). A conviction for general conspiracy, 18 U.S.C. § 371, “requires proof that the defendant agreed to commit an unlawful act and voluntarily participated in the conspiracy, and that an overt act was committed in furtherance of the conspiracy.” United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013). While we have described the presence of an agreement as the “sine qua non of a conspiracy,” Dellosantos, 649 F.3d at 115, “[t]he agreement itself need not be express, but may consist of no more than a tacit understanding,” United States v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993) (citation omitted). And to meet its burden, “[t]he government need not show that each conspirator knew of or had contact with all other members. Nor need it show that the conspirators knew all of the details of the conspiracy or participated in every act in furtherance of the conspiracy.” United States v. Soto-Beniquez, 356 F.3d 1, 19 (1st Cir. 2003).
Here, the government charged a conspiracy to commit honest-services mail fraud, a specific type of mail fraud involving a scheme “to deprive another of the intangible right of honest services.” 18 U.S.C. § 1346. The Supreme Court has held that this statute only criminalizes schemes involving bribes or kickbacks. Skilling v. United States, 561 U.S. 358, 412, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); see also United States v. Urciuoli, 613 F.3d 11, 17 (1st Cir. 2010) (“[T]hose who bribe public officials take part in a scheme to deprive the public of the honest services of those they attempt to influence.”). In the case at hand, the government specifically alleged that the defendants conspired to deprive the Board of Rodriguez’s honest services.
The defendants’ sufficiency of the evidence challenges to the honest-services fraud convictions need not detain us long. The trial evidence was sufficient for the jury to find the following facts. Julio Castro, Pacheco, and Davila all failed at least one of the required admissions exams. They later knowingly provided something of value to Rodriguez (through an intermediary) in exchange for falsified passing scores. Finally, use of the mails (e.g., mailing of letters indicating that the licenses *155 were ready for piek-up) was a foreseeable element of the scheme. See, e.g., United States v. Pimental, 380 F.3d 575, 589 (1st Cir. 2004) (holding that a defendant need not personally mail anything, so long as the “ ‘use of the mails’ in the course of the scheme” is “reasonably foreseeable” (collecting cases)).[7]
Pacheco argues that the alleged overt act, namely, the act of physically receiving medical licenses from the Board, fell outside the scope of the conspiracy. This argument fails because “[a] conspiracy endures as long as the co-conspirators endeavor to attain the ‘central criminal purposes’ of the conspiracy.” United States v. Upton, 559 F.3d 3, 10 (1st Cir. 2009) (quoting Grunewald v. United States, 353 U.S. 391, 401, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)). The government maintained throughout trial that the conspiratorial object of each defendant was fraudulently to gain a medical license, not merely to obtain a passing exam score. This is hardly a stretch, as a passing score on the threshold tests alone has only incremental value. We decline to overturn the jury’s finding that Pacheco’s receipt of her medical .license was an act within the scope and timeframe of the conspiracy. See id. at 11 (“Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury.”).
C. Aggravated Identity Theft
Berroa and Geraldo Castro also challenge their convictions for aggravated identity theft. In order to meet its burden on this charge, the government was required to show that each defendant “knowingly transferred], possessed], or use[d], without lawful authority, a means of identification of another person” and did so “in relation” to one or more specified crimes, including mail fraud. 18 U.S.C. § 1028A(a)(l), (c). The term “means of identification” is defined broadly to include names. Id. § 1028(d)(7). Where the necessary showing is made, “a term of imprisonment of 2 years” is added to the punishment for the underlying offense. Id. § 1028A(a)(l). In the present case, because we find insufficient evidence that the defendants “used” a means of identification within the meaning of the statute, we reT verse the identity theft convictions.
During the course of their medical practices (utilizing fraudulently obtained licenses), both defendants issued prescriptions that their patients would then fill at various pharmacies in Puerto Rico. The government alleges that the use of patient names and addresses on the prescriptions constituted use without lawful authority of the identification of another person.
In support of this argument, the government focuses on the absence of “lawful authority.” We have held that this statutory element does not “require that the means of identification be stolen, or otherwise taken without permission of the owner.” United States v. Ozuna-Cabrera, 663 F.3d 496, 498 (1st Cir. 2011). In reaching this result, we drew a distinction between the terms “authorized” and “lawful” to conclude that “regardless of how the means of identification is actually obtained, if its subsequent use breaks the law .... it is violative of § 1028A(a)(l).” Id. at 499. *156 Here, the government reasons, the patients’ consent to the inclusion of their names in the prescriptions is not disposi-tive. Such use was rendered unlawful by the fact that the defendants’ medical licenses were obtained by fraud. Moreover, the patients could not provide knowing consent because they were unaware of the underlying fraud. Ultimately, we need not resolve these issues. The government’s proof was insufficient to satisfy the separate requirement that the defendants knowingly “used” the patient information.
The Supreme Court has recognized that the word “use” is fraught with “interpreta-tional difficulties because of the different meanings attributable to it.” Bailey v. United States, 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), superseded by statute on other grounds, 18 U.S.C. § 924(c)(1). “Use” has been “variously defined as ‘[t]o convert to one’s service,’ ‘to employ,’ ‘to avail oneself of/ and ‘to carry out a purpose or action by means of.’ ” Id. at 145, 116 S.Ct. 501 (alteration in original). The statute at issue here fails to provide a specific definition. And, in context, “use” cannot be given its broadest possible meaning, which would subsume the separate statutory terms “transfer! 1” and “possess! ].” See United States v. Milter, 734 F.3d 530, 541 (6th Cir. 2013). Accordingly, we find the statutory language ambiguous. The Sixth Circuit has reached the same conclusion. See id. at 540-41.
We turn next to legislative history. The relevant House Report makes clear that the legislation was intended to address “the growing problem of identity theft.” See H.R. Rep. No. 108-528, at 3, reprinted in 2004 U.S.C.C.A.N. 779. The report goes on to provide several examples of identity theft. Notably, each of these examples involved the defendant’s use of personal information to pass him or herself off as another person, or the transfer of such information to a third party for use in a similar manner. See id. at 5-6, 2004 U.S.C.C.A.N. at 781-82 (e.g., submission of “bogus Federal income tax returns” in others’ names; use of “stolen identity to apply for and receive Social Security benefits” and “establish credit”). The facts of Ozuna-Cabrera, where the defendant presented another person’s expired passport in an attempt to obtain a valid passport under that person’s name, falls comfortably within this understanding of identity theft. See 663 F.3d at 497. By contrast, the purported “use” of patient information alleged here strays far afield from the conduct targeted by Congress. While, in a colloquial sense, Berroa and Castro could be said to have “used” their patients’ names in writing prescriptions, they certainly did not attempt to pass themselves off as the patients.
The government’s reading of the statute is virtually unlimited in scope. Indeed, if, as the government implies, “use” of a “means of identification” is to be given its broadest possible meaning, it could encompass every instance of specified criminal misconduct in which the defendant speaks or writes a third party’s name. See United States v. Spears, 729 F.3d 753, 756 (7th Cir. 2013) (warning, in interpreting the statutory language “another person,” that the government’s reading would “require a mandatory two-year consecutive sentence every time a tax-return preparer claims an improper deduction”). We will not lightly presume that Congress intended this extreme result.
In light of § 1028A’s legislative history, as well as the limitless nature of the government’s alternative construction, we read the term “use” to require that the defendant attempt to pass him or herself off as- another person or purport- to take some other action on another person’s be *157 half.[8] Our holding on this point is consistent with that of the only other circuit to have addressed the issue. See Miller, 734 F.3d at 541 (reversing convictions where the defendant “did not steal or possess [others’] identities, impersonate them or pass himself off as one of them, act on their behalf, or obtain anything of value in one of their names” (footnote omitted)); United States v. Medlock, 792 F.3d 700, 705 (6th Cir. 2015) (rejecting the government’s argument that the defendants “ ‘used’ the name and Medicare Identification Numbers of Medicare beneficiaries” when they submitted claims containing false statements).
III. Other Claims of Error
A. Indictment
Pacheco raises two challenges to her indictment: (1) that the district court erred by refusing to strike surplusage; and (2) that the court erred by amending the indictment.
Prior to trial, Pacheco moved, pursuant to Fed. R. Crim. P. 7(d), to strike surplusage from her indictment. Rule 7(d) serves to “protect the defendant ‘against immaterial or irrelevant allegations in an indictment, ... which may ... be prejudicial.’” United States v. Lewis, 40 F.3d 1325, 1346 (1st Cir. 1994) (alteration in original) (quoting Fed. R. Crim. P. 7(d), advisory committee note). Pacheco sought to strike any language related to her prior failures of Board exams and information about where and when she graduated from medical school.
The contested language was “neither irrelevant nor unfairly prejudicial.” Id. The prosecution had the burden of showing that Pacheco acted knowingly and intentionally in order to secure a conviction for conspiracy to commit honest-services mail fraud. And to that end, Pacheco’s prior exam failures and graduation date were relevant to her motive. See United States v. Pires, 642 F.3d 1, 11 (1st Cir. 2011) (“[E]vidence that bears on the question of motive ordinarily has some probative value in a criminal case.”). Pacheco’s difficulty in gaining a medical license on her own merit was appropriate information for the jury to consider in finding that she turned to illicit means. Accordingly, any prejudice resulting from the inclusion of this information in the indictment was not unfair.[9]
Pacheco next claims that the district court improperly allowed an amendment to her indictment. At issue is the date that the government alleged that Pacheco committed an overt act, namely, receipt of her regular medical license. The indictment initially identified the overt act as occurring on March 18, 2005, the date that Pacheco received her acupuncture license. The correct date should have been January 13, 2004. Over Pacheco’s objection, the district court amended the date on the indictment. We review her preserved challenge de novo. See United States v. Hernández, 490 F.3d 81, 83 (1st Cir. 2007).
As an initial matter, the error that Pacheco complains of is not a constructive amendment, but rather a direct *158 amendment. See United States v. Dowdell, 595 F.3d 50, 66-67 (1st Cir. 2010). While ah amendment that broadens the charges in an indictment runs afoul of a defendant’s rights and is, accordingly, prohibited, “this prohibition does not extend to alterations that are ‘merely a matter of form.’ ” Id. at 67 (quoting Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). Pursuant to this exception, courts may “allow[ ] ministerial corrections of clerical errors in names, dates, and citations, so long as the change [will] not deprive the defendant of notice of the charges against him.” Id at 68.
Here, there can be no argument that Pacheco was deprived of such notice. When identifying the overt act necessary for the conspiracy charge, the indictment explicitly stated that Pacheco “received a regular license to practice medicine in Puerto Rico.” Further, the evidence and theory throughout trial consistently maintained that the overt act was receipt of a regular medical license, not a specialized acupuncture license. In discovery, the government turned over Pacheco’s entire Board file, including her medical license dated January 13, 2004. In light of these facts, the amendment was a proper clerical change.
B. Other Evidentiary Claims
As part of its case, the government introduced evidence about non-defendant applicants who obtained false passing scores identical to the defendants’. On appeal, Pacheco and Davila challenge the admissibility of this evidence. Our review is for abuse of discretion. See United States v. Anthony, 545 F.3d 60, 66 (1st Cir. 2008).
The fact that the defendants obtained exactly the same scores as other applicants bore directly on the existence of a scheme to defraud. It also served to connect Rodriguez to those falsified scores that she did not specifically remember creating. Moreover, the evidence presented was less prejudicial than that in other cases where we have found no abuse of discretion. See, e.g., United States v. McGauley, 279 F.3d 62, 72 (1st Cir. 2002) (upholding admission of 217 fraudulently obtained refund checks not charged in indictment). Given the probative value of the evidence, the defendants fall well short of establishing “extraordinarily compelling circumstances” such that we will, “from the vista of a cold appellate record, reverse a district court’s on-the-spot judgment concerning the relative weighing of probative value and unfair effect.” United States v. Williams, 717 F.3d 35, 41 (1st Cir. 2013) (citation omitted).[10]
C. Alleged Judicial Bias
The defendants next contend that the district court exhibited bias in favor of the prosecution. “Under the usual framework for judicial bias claims, a party must ... show (1) that the [judge’s] comments were improper and (2) that there was serious prejudice.” United States v. Lanza-Vázquez, 799 F.3d 134, 143 (1st Cir. 2015) (second alteration in original) (citation omitted). In controlling the courtroom, “[i]t is well-established that a judge ‘is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.’ ” Id. (quoting Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. *159 698, 77 L.Ed. 1321 (1933)). Accordingly, “ ‘remarks during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases’ are usually insufficient to prove bias.” United States v. Caramadre, 807 F.3d 359, 375 (1st Cir. 2015) (quoting Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)).
Here, Davila points to a number of instances during the cross-examination of three government witnesses where the judge sustained objections and commented in open court on the nature of the defense questions.[11] Berroa separately takes issue ■with the court’s admonishing his counsel not to interrupt the prosecutor’s closing argument and its indication that counsel was “misstating” the law. We conclude that, at most, the district court indicated moderate displeasure with defense counsel. This conduct was more benign than that found insufficient to warrant reversal in previous cases. See, e.g., Lanza-Vázquez, 799 F.3d at 143-45. The statements identified by the defendants represent “the few instances of the trial court’s frustration, cherry-picked from the voluminous record” and, as a result, “do not reveal judicial bias, let alone the serious prejudice” required for reversal. United States v. Ofray-Campos, 534 F.3d 1, 34 (1st Cir. 2008).
D. Defense Witness Immunity
Berroa, Davila, and Pacheco assert that the district court erred by refusing to grant use immunity to former Board employee Dr. Rafael Jiménez-Méndez. The defendants claim that Jiménez’s testimony was necessary to contradict the government’s case and attack the credibility of the government’s witnesses.
The power and discretion to immunize witnesses lies primarily with the prosecution. Trial courts have the ability to grant immunity to a witness upon a showing that the government’s refusal to provide said immunity violated the defendant’s due process rights. See United States v. Angiulo, 897 F.2d 1169, 1190 (1st Cir. 1990). In order to prevail on such a claim, a defendant must establish that the government intentionally attempted to present a distorted version of the facts at trial. See Curtis v. Duval, 124 F.3d 1, 9 (1st Cir. 1997). “This type of deliberate distortion can occur in two ways: if the government attempts to intimidate or harass a potential witness, or if the prosecutor purposefully withholds use immunity to hide exculpatory evidence from the jury.” United States v. Castro, 129 F.3d 226, 232 (1st Cir. 1997).
Jiménez entered into a pre-trial diversion agreement containing a promise by the government not to bring any federal charges against him in relation to the scandal at the Board. Upon being called to testify, Jiménez invoked his Fifth Amendment right not to incriminate himself. See U.S. Const, amend. V. The defense objected, citing the pre-trial diversion agreement. Rejecting this argument, the district court found that Jiménez was only protected from federal charges and, thus, there was a cognizable risk that his testimony could be used against him in a Puerto Rico court. See United States v. Jiménez-Bencevi, 788 F.3d 7, 15 (1st Cir. 2015) (“Informal immunity agreements ... are shaped *160 ... by the language of the contract conferring the immunity.” (citation omitted)).
In her brief, Pacheco points to Jiménez’s presence on a witness list for an upcoming trial as proof that the government planned to offer immunity to him. When asked at a status conference in the subsequent case about potential trial witnesses, the prosecutor responded that Jiménez could potentially testify but no final decision had been made at that time. While this response may have been ambiguous, it is not the type of “affirmative government misconduct” required to show a due process violation and compel the government to grant immunity. United States v. Mackey, 117 F.3d 24, 27 (1st Cir. 1997).[12]
Moreover, the purported value of Jimé-nez’s testimony was minimal at best and cumulative of other witnesses. The bulk of Jiménez’s purported value was to respond to Rodriguez’s testimony that she was unaware of any score-fixing schemes at the Board other than her own. Pacheco avers that Jiménez would testify otherwise and would offer further evidence about misconduct and sloppy record-keeping at the Board. Assuming that such information would have been admissible, Pacheco had other witnesses available (as noted by the district court) who could offer similar testimony. This fact further undercuts any assertion that the government sought to “withhold[ ] use immunity to hide exculpatory evidence from the jury.” Castro, 129 F.3d at 232.[13]
E. Jury Instructions
Pacheco and Davila argue that the district court erred by not including certain jury instructions in its charge for conspiracy to commit honest-services mail fraud. Both defendants assert that they were entitled to a gifts instruction, and Davila argues that the district court also should have issued a good faith instruction.
We assess a district court’s refusal to give a requested instruction in two steps. First, we look de novo to see whether the evidence, taken in a light most favorable to the defendant, supports the instruction. United States v. Baird, 712 F.3d 623, 627 (1st Cir. 2013). If the defendant makes this showing, we proceed to the second step where “refusal to give a requested instruction is reversible error only if the instruction was (1) substantively correct; (2) not substantially covered elsewhere in the charge; and (3) concerned a sufficiently important point that the failure to give it seriously impaired the defendant’s ability to present his or her defense.” United States v. Callipari, 368 F.3d 22, 32 (1st Cir. 2004) (citation omitted), vacated on other grounds, 543 U.S. 1098, 125 S.Ct. 985, 160 L.Ed.2d 998 (2005).
First, relying upon our decision in United States v. Sawyer, 85 F.3d 713, 741 (1st Cir. 1996), the defendants argue that the jury was required to consider whether the payments to Rodriguez were gifts (and not bribes). We need not move beyond the first stage of our inquiry because the *161 facts — even in a light most favorable to the defendants—fail to sufficiently support a gifts instruction. In Sawyer, we advised that a cautionary instruction is needed “where ... the line between the merely unattractive and actually criminal conduct is blurred.” Id. Such blurring occurs when the conduct in question (e.g., “payments for entertainment, lodging, golf, sports events, and the like”) could colorably be an attempt to “cultivate a business or political ‘friendship.’ ” Id. Here, there was no evidence to suggest that the payments by the defendants were designed to cultivate such a friendship. Rather, they were made in exchange for fraudulent scores.
With respect to the second requested instruction, “we have held that [a] separate instruction on good faith is not required ... where the court adequately instructs on intent to defraud.” Christopher, 142 F.3d at 55 (first alteration in original) (citation omitted). This is because intent to defraud is “essentially the opposite of good faith.” United States v. Dockray, 943 F.2d 152, 155 (1st Cir. 1991). Here, a review of the transcript makes clear that the district court provided adequate instructions. The court told the jury that “[t]o establish specific intent, the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law.” Accordingly, no separate good faith instruction was required.[14]
F. Purported Prosecutorial Misconduct
Davila identifies several instances of purported prosecutorial misconduct during opening, closing, and rebuttal arguments. Her admittedly unpreserved claims that the prosecutor misstated certain evidence fail because, even assuming that the relevant statements were improper, they did not “so poison[ ] the well” as to require a new trial. See United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003) (citation omitted). Davila’s preserved argument that the prosecutor improperly shifted the burden of proof, however, merits further discussion.
We review the propriety of the prosecutor’s comments de novo. United States v. Glover, 558 F.3d 71, 76 (1st Cir. 2009). If we find that the statements were improper, we must determine whether the error was harmless. let With respect to the first step in the analysis, “a prosecutor may cross the line [into impermissibility] by arguing to the jury that the defendant is obligated to present evidence of his innocence.” Id. at 77 (alternation in original) (citation omitted). With that said, the government is afforded some latitude “to discuss competing inferences from the evidence on the record” and “to comment on the plausibility of the defendant’s theory.” Id. at 77-78. In doing so, prosecutors must focus “on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what he or she has shown or failed to show.” Id. at 78.
Here, Davila takes issue with excerpts of the prosecutor’s rebuttal argu*ment referring to defense counsel’s failure to provide “innocent explanations” for or otherwise address (1) evidence that the defendants’ false test results were identical to those of other applicants and (2) Davi-la’s request for a certification of her score. At trial, the defendants sought to use evidence of Board irregularities to suggest *162 that they might not have been complicit in the falsification of their own test scores. Accordingly, the prosecutor was entitled to respond by contesting the plausibility of that defense theory.
It is at least arguable, however, that the prosecutor exceeded the bounds of propriety by specifically referring to defense counsel’s failure to address aspects of the prosecution’s case. See United States v. Wihbey, 75 F.3d 761, 770 (1st Cir. 1996) (referring to “how-does-counsel-explain” argument as “an impermissible shift of [the] burden of proof’ (citation omitted)). Assuming (without deciding) that the specific invocation of defense counsel’s omissions was improper, we turn to the issue of prejudice.
Reversal is warranted only if the possibly improper statements were “harmful.” Glover, 558 F.3d at 78. In making this assessment, “we consider the totality of the circumstances, including the severity of the misconduct, the prosecutor’s purpose in making the statement ..., the weight of the evidence supporting the verdict, jury instructions, and curative instructions.” Id. (citation omitted). Here, Davila points to three isolated passages from the government’s rebuttal argument. Moreover, the prosecutor appears to have acted with the permissible goal of rebutting the defense theory, rather than intentionally shifting the burden to the defendants. To cinch the matter, the court* clearly instructed the jury:
[I]t is a cardinal principle of our system of justice that every person accused of a crime is presumed to be innocent unless and until his or her guilt is established beyond a reasonable doubt. The presumption is not a mere formality, it is a matter of the most important substance.
The Defendants do not have to prove .their innocence at any time or to produce any evidence.... The burden of proof never shifts to a defendant. It is always the Government’s burden to prove each of the elements of the crimes charged beyond a reasonable doubt....
In light of the significant evidence against the defendants, the context of the prosecutor’s statements, and the court’s strong and unequivocal instruction on the presumption of innocence, any impropriety in the prosecutor’s rebuttal argument was harmless.
G. Sentencing
Finally, Pacheco challenges the district court’s application of a twelve-level sentencing enhancement pursuant to United States Sentencing Guidelines § 201.1(b)(2)(A) and § 2Bl.l(b)(l)(G).[15] We review the district court’s fact-finding for clear error and its interpretation of the Guidelines de novo. United States v. Souza, 749 F.3d 74, 85 (1st Cir. 2014). Relying on the pre-sentence investigation report, the court calculated the benefit Pacheco received in return for her bribe to be more than $200,000 but less than $400,000. Pacheco now seeks to vacate her sentence, arguing that the phrase “benefit ... to be received in return for the payment” in § 201.1(b)(2)(A) does not include her medical license or earnings realized therefrom.
Contrary to Pacheco’s contention, the sentencing court may apply the § 201.1(b)(2)(A) enhancement so long as the defendant actually received or expected to receive the requisite benefit. See, e.g., United States v. Vázquez-Botet, 532 F.3d 37, 67 (1st Cir. 2008). Here, the district court relied on the actual benefit Pa *163 checo received from practicing under the aegis of her fraudulent license. To the extent the court also considered expected benefit, we see no error (let alone clear error) in its finding that Pacheco intended to receive a financial benefit from obtaining her medical license.[16]
IV. Conclusion
For the foregoing reasons, we affirm the convictions and sentences of Pacheco and Davila (both of whom were convicted only of honest-services mail fraud conspiracy). By contrast, we reverse the convictions and vacate the sentence of Geraldo Castro (who was convicted only of mail fraud and aggravated identity theft).
With respect to the remaining two defendants, Berroa and Julio Castro, we reverse their convictions for money or property mail fraud and affirm their convictions for honest-services mail fraud conspiracy. Finally, we reverse Berroa’s convictions for aggravated identity theft. Under our caselaw, the partial reversal of Berroa’s and Julio Castro’s convictions may “alter the dimensions of the sentencing ‘package.’ ” United States v. Genao-Sánchez, 525 F.3d 67, 71 (1st Cir. 2008). We therefore vacate the sentences of these defendants and remand for resen-tencing. We take no view as to whether the new sentences should be equal to or less than the sentences previously imposed. That is a matter committed, in the first instance, to the sound discretion of the sentencing court.

. We reject as meritless (1) Davila’s argument that she was entitled to receive daily transcripts under the' Criminal Justice Act because, even assuming such an entitlement, she fails to develop any claim of prejudice, see United States v. Bari, 750 F.2d 1169, 1182 (2d Cir. 1984); and (2) Julio Castro’s contention that a mistrial was required because the court accidentally read a sidebar conversation to the jury reflecting the date of the exam he failed (a fact which was already in evidence).

. The district court separated the applicants into various groupings for trial.

. The jury acquitted a sixth defendant of all charges.

. We are puzzled by the dissent’s intimation that this requirement does not relate to causation. See Merriam-Webster’s Collegiate Dictionary (10th ed. 2001) (defining "induce” as "effect, cause”). Indeed, as the Loughrin Court explained, "[t]he ‘by means of phrase calls for an inquiry into the directness of the *150 relationship between means and ends.” 134 S.Ct. at 2394 n.8.
We are confident in courts’ ability to engage in this analysis, which evokes the familiar concept of proximate causation. See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (explaining that this doctrine has traditionally required "some direct relation between the injury asserted and the injurious conduct alleged”). Of course, Loughrin’s "naturally inducing” test, much like proximate causation, is “flexible” and "does not lend itself to a black-letter rule that will dictate the result in every case.” Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (citation omitted). For this reason, we limit our holding to the facts of the present appeals.

. Of course, we do not mean to imply that courts have always interpreted the mail fraud and bank fraud statutes identically. In Lough-rin, for example, the Supreme Court was not swayed by the defendant's “counterintuitive argument” that the two separate subsections of the bank fraud statute, set apart by a disjunctive "or,” did not have any “independent meaning.” 134 S.Ct. at 2390. The defendant's contention on this point was based on McNally’s construction of the mail fraud statute. The Court rejected this argument, citing several relevant "textual differences” between the mail fraud and bank fraud prohibitions. Id. at 2391. “The mail fraud law contains two phrases strung together in a single, unbroken sentence. By contrast, § 1344’s two clauses have separate numbers, line breaks before, between, and after them, and equivalent indentation'—thus placing the clauses visually on an equal footing and indicating that they have separate meanings.” Id. Here, unlike in Loughrin, the defendants' argument that “by means of” requires a direct causal connection is far from counterintuitive. And the relevant language is identical in both statutes.
We are similarly unmoved by the dissent’s invocation of the “chronological problem” that the Loughrin Court identified in the defendant's reliance on McNally. Id. The Court did not reject the McNally argument merely because that case was decided after Congress's passage of the bank fraud statute. Indeed, by that logic, we would be unable to rely on mail fraud precedents decided after 1952 to interpret the wire fraud statute. See Fermin Castillo, 829 F.2d at 1198-99. Rather, the chronological problem in Loughrin was unique: not only had McNally not yet been decided when the bank fraud statute was enacted, but, “at that time, every Court of Appeals to have addressed the issue” had reached the opposite result. Loughrin, 134 S.Ct. at 2391. In these unique circumstances, Congress "could hardly have predicted that *152 McNally would overturn the lower courts' uniform reading.” IA

. Only one of the cases relied upon by the dissent was decided after Loughrin. See United States v. Greenberg, 835 F.3d 295 (2d Cir. 2016). Greenberg, citing Christopher, simply held that "the wire fraud statute does not impose a convergence requirement.” Id. at 307. It did not purport to interpret the phrase "by means of,” nor did it so much as mention Loughrin.

. Unlike the other, defendants, Berroa was acquitted of the conspiracy count related to his own exam but was convicted of assisting another applicant, Evelyn Rodriguez ("Evelyn”), to falsify her score. Evelyn testified that Berroa told her that he knew someone who would be able to help her get a passing score and went on to facilitate the introduction. Evelyn subsequently made two payments totaling $1,300 in return for her passing score. This evidence permitted the jury to conclude that Berroa was an active participant in the conspiracy, not a mere passive bystander.

. To the extent more is needed, the rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.” United States v. Gray, 780 F.3d 458, 468 (1st Cir. 2015) (citation omitted). At the very least, the statutory provision is ambiguous and, accordingly, we must read it narrowly.

. Pacheco raises a parallel challenge to the admission of this evidence under Fed. R. Evid. 401 and 403. These arguments fail for the same reasons outlined above, namely, the probative value of the information in question and absence of any unfair prejudice.

. Along similar lines, Pacheco argues that the testimony of non-defendant conspirators created a spillover effect such that her conviction must be vacated. Her claim is meritless because "defendants cannot complain of an improper spillover effect where evidence is independently admissible against them.” Soto-Beniquez, 356 F.3d at 29. In any event, Pacheco fails to make the required showing of prejudice. See United States v. Trainor, 477 F.3d 24, 36 (1st Cir. 2007).

. We note that many of Davila’s claims appear to challenge the judge’s evidentiary rulings on relevance. See Fed. R. Evid. 401. Pacheco similarly contests the district court's refusal to allow evidence of irregularities at the Board as violative of her Fifth and Sixth Amendment rights. We discern no abuse of discretion in the trial judge’s disposition of these issues. See United States v. Jimenez, 507 F.3d 13, 16 (1st Cir. 2007); United States v. Perez-Ruiz, 353 F.3d 1, 11 (1st Cir. 2003).

. Pacheco contends, for the first time on appeal, that two other witnesses faced the same situation as Jiménez. These claims fare no better under the more exacting plain error standard. See United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012).

. Berroa and Pacheco also challenge the district court's exclusion of certain government memoranda reflecting interviews with Jimé-nez and others. Even assuming that the interviewees’ statements contained in the memo-randa fell within a hearsay exception, see Fed. R. Evid. 804(b)(3), the agents’ reports themselves constituted a second layer of inadmissible hearsay. See, e.g., United States v. Ortiz, 125 F.3d 630, 632 (8th Cir. 1997) (holding that report prepared by government agent and reflecting statements by an informant did not fall within the public records exception).

. Davila also seeks reversal based on the cumulative error doctrine. “Since we rejected all of [Davila's] claims of error, it necessarily follows that [her] trial was not tainted by cumulative error and reversal is not warranted.” United States v. Rivera-Donate, 682 F.3d 120, 132 n.11 (1st Cir. 2012) (citation omitted).

. In accordance with U.S.S.G. § 1B1.11(b)(1), the district court applied the Guidelines as effective on the date the offense was committed. Accordingly, all references herein are to the Guidelines as effective on November 1, 2002.

. While the medical license did not constitute " 'property' in the government regulator's hands” for purposes of the mail fraud statute, see Cleveland, 531 U.S. at 20, 121 S.Ct. 365, it certainly held an expected benefit for Pacheco. That was, after all, the point of the fraud.